**BASF WYANDOTTE CORP., formerly Wyandotte Chemical Corp., Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 75–1596.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1975.

Decided March 4, 1976.

**532**

Steven Uzelac, Miller, Canfield, Pattock & Stone, Paul R. Wassenaar, Detroit, Mich., for petitioner-appellant.

Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Jr., Gary R. Allen, William A. Whitledge, Tax Div., U. S. Dept. of Justice, Washington, D. C., for respondent-appellee.

Before PHILLIPS, Chief Judge, McCREE, Circuit Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This is an appeal from the decision of the United States Tax Court holding that appellant is liable for deficiencies for the taxable years of 1964 and 1965 in the amounts of $5,228.65 and $156,027.87, respectively, in which Judge W. M. Drennen filed an opinion and findings, and entered the decision reported in 62 T.C. 704.

At the outset it should be observed that the facts in the case are undisputed. The only questions involved are questions of law and the interpretations of the law as applied to the facts. While the facts are undisputed, it is necessary to recite them at length since the case is a complicated controversy of tax law and, without the factual background, the conclusions reached by the Tax Court and the arguments of the parties would be difficult of comprehension. The briefs of the parties are notable. Government counsel's brief is worthy of remark, and counsel for appellant, Wyandotte, have ably and cogently advanced every argument that could be made for their client.

In Judge Drennen's opinion and in the stipulations filed, the facts are fully stated and therein it appears that petitioner-appellant was a Michigan corporation with its principal offices in Wyandotte, Michigan, at the time its petition was filed; that appellant is the successor by merger to Wyandotte Chemical Corporation (Wyandotte), which was also a Michigan corporation, whose principal offices were in Wyandotte, Michigan. Wyandotte's returns for the years 1964 and 1965 were filed with the District Director of Internal Revenue at Detroit. Appellant Wyandotte kept its books and reports of income on the accrual method of accounting.

As part of its chemical manufacturing business, appellant-taxpayer, prior to 1965, owned and operated a steam-generating plant and an electricity-generating plant, both of which, as above stated, were located in Wyandotte, Michigan, taxpayer's principal place of business. These plants were used to supply steam and electrical power necessary in taxpayer's chemical manufacturing processes. Taxpayer had constructed these plants over a period of years and originally computed the useful life and depreciation deductions separately on some 1,500 individual items of equipment contained in the power plants. Involved in this appeal are the items of power-plant equipment (turbo-generators, boilers, motors, pumps, switches, conveyors, turbines, power lines and similar items) which the taxpayer had depreciated under the straight-line method of depreciation from the acquisition of each item until January 1, 1962. Only the equipment depreciated on a straight-line basis is involved in this case, which was referred to by the Tax Court as "straight-line properties." Some of these items of equipment had been acquired as early as 1926 and, on January 1, 1962, many items had been fully depreciated, thus having a basis of zero.

We have taken much of the foregoing from the opinion of Judge Drennen as well as from the brief of the Commissioner, and we shall continue outlining the statement of facts by freely taking from the court's opinion and from the briefs of the parties without attribution thereof, except where specifically indicated.

The aggregate original cost of the straight-line properties was $9,955,116 and, prior to January 1, 1962, an aggregate of $7,109,791 had been allowed (or was allowable) as depreciation for tax purposes under Section 167 of the Internal Revenue Code. Thus, on January 1, 1962, the total undepreciated cost of the straight-line properties was $2,845,325.

In 1962, taxpayer made an election (effective January 1, 1962) pursuant to Section 1.167(a)–7(a) of the Treasury Regulations on Income Tax (1954 Code) (26 C.F.R.) to depreciate all its straight-line power plant property and other numerous items of machinery and equipment used in its chemical business in one open-ended multiple asset account. The taxpayer transferred property (including the straight-line power plant properties) with a total original cost of $62,865,357 to its newly-formed multiple asset account. Total depreciation allowed or allowable in prior years (including depreciation attributable to the straight-line power plant properties) amounted to $45,865,357, leaving a basis for future depreciation of $17,060,606. For 1962 and subsequent years, taxpayer computed its depreciation on the multiple asset account under the straight-line method using an eleven-year useful life, pursuant to Rev. Proc. 62–21, 1962–2 Cum. Bull. 418,422 (chemical and allied industries). Subsequent to January 1, 1962, taxpayer purchased new power plant equipment at a cost of $32,316, and such equipment was added to the multiple asset account. Under Rev. Proc. 62–21, *supra*, depreciation is computed on the basis of total original cost of the multiple asset account regardless of whether or not the individual assets in that account have been fully depreciated. In 1965, the taxpayer incurred sufficient allowable depreciation to reduce the undepreciated basis of the multiple asset account to zero.

On December 18, 1965, taxpayer sold the steam and electric generating plants to Detroit Edison Co., and thereafter purchased its power and steam from Detroit Edison. The bill of sale recited that Edison purchased the buildings for $850,000 and the machinery and equipment for $3,150,000, but did not otherwise allocate the purchase price among the 1,500 items of power plant equipment. The taxpayer thereafter hired the American Appraisal Company (American) to appraise the property which appellant had sold, in order to allocate that part of the purchase price ($3,150,000), allocated by the bill of sale to machinery and equipment, among the 1,500 individual items involved in the sale. The report of the appraisal company stated that a field audit was undertaken to ascertain the "overall condition and physical depreciation associat-

ed with the property." The appraisal company report then explained how it had allocated the sale price among the assets:

"The $3,150,000 sales price for the entire list of assets was distributed to the individual items on the basis of estimated reproduction cost new less depreciation. The estimated reproduction cost new was obtained by trending the recorded original cost by subaccount groups to current cost levels by the application of appropriate index numbers. The estimated reproduction cost new less depreciation calculation reflects the estimated reproduction cost new in combination with the expired and estimated remaining life of the property, our field observations, and our knowledge of this type of property. The depreciation assigned considers all factors except economic considerations. The reproduction cost new less depreciation base for distribution of the $3,150,000 assumes that the property will continue in use and that the economic gain associated with the property through continued use would properly relate to the $3,150,000 supplied to us. The distribution of the sale price has been within one class of property, machinery, and equipment, and considers that the property items within this classification have similar depreciation characteristics."

In reporting its gain on the sale, taxpayer treated the amount of sale price allocated to each asset by American's appraisal report as the amount realized from the sale of that asset. Taxpayer reported the lesser of the amount of gain attributed by it to each item or the amount of depreciation it attributed to that item, or the amount of depreciation it attributed to that item for periods after January 1, 1962, as ordinary income pursuant to Section 1245 of the Internal Revenue Code of 1954. The remainder of the gain was reported as long term capital gain from the sale of depreciable property used in taxpayer's trade or business under Section 1231 of the Internal Revenue Code. Taxpayer reported a total gain on the sale of the straight-line properties of $1,775,854, of which $904,509 was treated as long term capital gain and $871,345 was treated as

depreciation recapture under Section 1245. The Commissioner accepted taxpayer's allocation of $2,676,523 of the sales price to the straight-line properties, but determined that the entire gain was taxable as ordinary income under the depreciation recapture provisions of Section 1245, and issued a deficiency notice which explained:

"It is held that you realized a gain of $2,676,523 on the sale of certain machinery and equipment in 1965, and that all of such gain must be treated as gain from the sale of property which is neither a capital asset nor property described in Section 1231 of the Code."

The deficiency notice did not state the particular theory upon which the Commissioner was proceeding with respect to the determination that the entire gain on the straight-line properties was subject to the depreciation recapture provisions of Section 1245 but, at trial, counsel for the Commissioner indicated that he was relying on alternative grounds for this determination: (1) that the particular items in question lost their identity as individual assets for the purpose of Section 1245 computation after they were placed in the multiple asset depreciation account; and (2) that even if Section 1245 could be properly applied to the amount realized on the sale of separate items from the multiple asset account, taxpayer had failed to establish a basis for allocating the sales price among the 1,500 separate items involved.

Counsel for the taxpayer, however, indicated that he had not anticipated the second argument, and was not prepared to present evidence on that point. The court thereupon indicated that the trial should proceed, but that it would be receptive to a motion for a further trial after the briefs were filed in the event the Commissioner continued to assert the alternative argument. Several months after the final briefs were submitted by the Commissioner, during which no motion for further trial on the alternative argument asserted by the Commissioner was filed, the Tax Court issued its findings of fact and opinion holding that taxpayer would be entitled to compute its

Section 1245 gain on each particular asset in the multiple asset group where a portion of the sales price is shown to be properly allocable to such asset, but sustaining the deficiency on the ground that taxpayer failed to establish a proper basis for allocating the total sales price among the assets involved, as would be necessary to compute its Section 1245 gain on the individual asset basis. Nearly four months after the findings and opinion were filed, the Tax Court entered its decision and it was not until the decision was entered that taxpayer filed a motion to vacate the decision entered in favor of the Commissioner, and a motion for leave to file out of time its motion for further trial. These motions were thereafter denied by the Tax Court, and the taxpayer appealed.

In passing upon the questions above presented, Judge Drennen in his opinion in the Tax Court said:

"While it may appear that under petitioner's theory as applied in this case petitioners are not being charged with section 1245 gain equal to the amount of depreciation allowed with respect to the multiple-asset account subsequent to December 31, 1961, the reason is that the law limits the amount of recapturable depreciation to the amount by which the *lower* of the 'recomputed basis' and the 'amount realized' on the sale exceeds the adjusted basis of the property sold. If the 'amount realized' or sale price of the asset sold is less than the 'recomputed basis' of that asset, there will be some depreciation that was allowed on that asset after December 31, 1961, that will not be recaptured. And the fact that the original cost of a fully depreciated asset placed in the multiple-asset account is used in computing the amount of depreciation allowable on the multiple-asset account each year does not mean that additional depreciation is being allowed on the fully depreciated asset; it simply means that the cost or adjusted basis of those assets which were not fully depreciated when placed in the account is being amortized or depreciated more rapidly

than if depreciated in a single-asset account.

"We conclude, as urged by petitioner, that when a number of section 1245 properties are abnormally retired by individual sale from a multiple-asset account, the portions of the gain realized on the sale or other disposition that will be taxed as ordinary income, or section 1245 gain, should be computed with respect to each individual property, where possible, and that the section 1245 gain attributable to any individual property retired is limited to its adjusted basis at the time it is placed in the multiple-asset account.

"However, this does not necessarily provide the answer to the issue here involved. We are also of the opinion that if all of the section 1245 properties in the multiple-asset account are sold in one transaction under circumstances that indicate the parties regarded the property sold as a single integrated asset, and it is also impossible to determine with any certitude an appropriate allocation of the sale prices among the component parts so that it would be impossible to determine the gain realized on the sale of the individual properties, it is proper for the respondent to determine the section 1245 gain on the sale by treating all of the properties sold as one item with one aggregate adjusted basis and recomputed basis, limited, however, to the aggregate of the adjusted bases of all the properties when they are put into the multiple-asset account after December 31, 1961."

The Court then proceeded to discuss the evidence as to whether the sale of the two power plants by the taxpayer to the Detroit Edison Company was a single transaction, the sale of a single asset, or was a sale of each of the component parts of the power plant; and, if the latter, whether there was sufficient evidence in the record to permit an allocation of the sale price to each of the component parts. In this regard, the court said:

"The only evidence of the character of the transaction that we have is a bill of sale between Wyandotte and Detroit Edi-

son. By the terms of that document, for and in consideration of $4 million to it paid by Edison, of which $850,000 was for buildings and $3,150,000 was for machinery and equipment, Wyandotte granted and conveyed to Edison all of the buildings and steam and electrical generating facilities at its North Works and South Works in Wyandotte, Mich., 'together with related electrical facilities, tie cables, reactors, switchgear and transformers plus certain coal handling facilities on the premises * * * and the electric cables between the two plants and including (but not by way of limitation) items on the "Schedules to Bill of Sale" which are hereto attached and made a part hereof.' No schedules were attached to the bill of sale document offered as an exhibit. On the face of it the bill of sale suggests that the transaction was a sale of two power plants, with an allocation of the sale price only between the buildings and the machinery and equipment. There is no evidence that the parties intended any other type of transaction or that a further allocation of that part of the sales price allocated to machinery and equipment was intended to be made. Nor is there any evidence that the bill of sale did not represent the substance of the transaction between the parties. This is not a case where the evidence gives the Court reason to believe that the substance of the transaction was any different than evidenced by the document used to make the transfer and sale.

"At the opening of the trial there appeared to be some misunderstanding between counsel for the parties as to the respective theories they were relying on, which the Court was unable to resolve entirely, but counsel for petitioner was aware of the fact that respondent had treated the transaction as the sale of a single asset and that the burden was on petitioner to offer evidence to rebut the presumption of correctness of respondent's determination, particularly in light of the bill of sale. This petitioner did not successfully do."

The Court then indicated the Regulations governing such transaction:

"Section 1.1245–1(a)(5), Income Tax Regs., provides that in case of a sale of section 1245 and non-section 1245 property in one transaction, the total amount realized upon the disposition shall be 'allocated between the section 1245 property and the non-section 1245 property in proportion to their respective fair market values.' If the buyer and seller have adverse interests as to the allocation of the amount realized between the section 1245 and non-section 1245 properties, any arm's-length agreement between the buyer and seller will establish the allocation. In the absence of such an agreement, the allocation shall be made by taking into account the appropriate facts and circumstances, such as the cost and reproduction cost, the remaining economic useful life, etc.

"While the above paragraph of the regulations recognizes the _necessity of allocating sales price between section 1245 property and non-section 1245 property where both are sold in one transaction,_ and methods for making the allocation where it has not been made by the buyer and seller, this does not mean that an arbitrary allocation of the sales price _between the section 1245 assets alone_ can be made by the seller for section 1245 purposes. Furthermore, we do not believe the cases which have permitted allocation of sale price even though no allocation was made in the sales contract are apposite here. See, for example, _Helvering v. Taylor,_ 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); _Commissioner v. Ferrer,_ 304 F.2d 125 (C.A. 2, 1962), reversing in part 35 T.C. 617 (1961); _First Pennsylvania Banking Co.,_ 56 T.C. 677 (1971). _In those cases there were different types of properties involved; here, they are all section 1245 properties._" (Emphasis supplied.)

The Court then observed:

"But even if it was agreed that the transaction was intended to be a sale of the 1,500 individual assets contained in

the straight-line properties account, we do not have competent evidence that would provide an acceptable basis for allocating the lump-sum sale price among the various components. The petitioner offered the report of an appraisal company which had been employed by Wyandotte in the early part of 1966 to conduct studies to distribute the sale price of powerplant property that was sold on December 17, 1965; and the testimony of an accountant who testified how the section 1245 gain had been computed for Wyandotte's 1965 tax return, based on the appraisal report. The appraisal report indicated that a list of the property items sold and the sale price of $3,150,000 had been supplied by Wyandotte. The report states that:

" 'The $3,150,000 sale price for the entire list of assets was distributed to the individual items on the basis of estimated reproduction cost new less depreciation. The estimated reproduction cost new was obtained by trending the recorded original cost by subaccount groups to current cost levels by the application of appropriate index numbers. The estimated reproduction cost new less depreciation calculation reflects the estimated reproduction cost new in combination with the expired and estimated remaining life of the property, our field observations, and our knowledge of this type of property. The depreciation assigned considers all factors, except economic considerations.
\* \* \*'

"Without some further explanation, which we do not have, we are not even certain that the approach used by the appraiser properly reflects the relative values of the various assets involved nor an acceptable method of allocating sales price. But absent some evidence that the parties to the transactions intended that an allocation of the sales price be made and agreed that such an appraisal approach be used to make the allocation, we cannot accept this evidence as prima facie proof of the proper allocation of the lump-sum sales price.

"Where the issue before the Court is to determine the amount of the gain on sale of section 1245 property that is section 1245 gain and the amount that is capital gain, the actual sales price of the assets involved is vitally important because it is one of the limiting factors in determining the amount of section 1245 gain, as it undoubtedly was here. Section 1245(a)(1)(B) uses the language:

(i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

(ii) in the case of any other disposition, the fair market value of such property. *This was clearly a sale and the 'amount realized' on the sale of the property is a limiting factor, not the fair market value as would be the case in the event of 'any other disposition' of the property. In our opinion a mechanically reconstructed fair market value of the section 1245 assets is not an acceptable basis, under the circumstances here present, upon which to allocate the lump-sum sales price of the straight-line properties among the 1,500 components thereof."* (Emphasis supplied.)

In accordance with the foregoing, the Tax Court concluded:

"Under these circumstances, we must sustain respondent's determination on this issue, as modified by his concessions. Section 1.1245–1(a)(4), Income Tax Regs., provides that a *taxpayer* may treat any number of units of section 1245 property in any particular depreciation account as one item of section 1245 property, as long as it is reasonably clear that the amount of section 1245 gain is not less than the total of the section 1245 gain computed separately for each unit. We recognize that the provision refers only to 'a taxpayer'; but we see no reason the same principle should not be used by the Commissioner when there is no adequate basis upon which to accurately compute the section 1245 gain on each individual asset sold in a single transaction for a lump-sum price. In this case it would appear that using the above method would not

result in recapture of more depreciation than had been allowed petitioner on these straight-line properties because the lump-sum sale price was less than the depreciation allowed and becomes the limiting factor."

Decision was entered sustaining the Commissioner's findings of deficiencies.

As previously said, the Commissioner has sought to sustain his determination on the alternative grounds (1) that even if an appropriate basis for allocating the sale prices among the individual assets had been shown, an item by item Section 1245 computation was precluded by the fact that the various items of equipment had lost their individual identity for depreciation purposes when placed in the multiple-asset depreciation account, and (2) that, in any event, taxpayer had established no basis on the record for allocating the sales price among the individual items of equipment under the circumstances of this case. The Tax Court rejected the first theory, agreeing with taxpayer that an item by item Section 1245 computation is permissible if the taxpayer establishes a proper basis for allocating the sales price among the individual items of equipment (and the Commissioner does not here challenge this conclusion). However, the Court concluded that taxpayer here had not established a proper basis for allocating the sales price among the various individual items in question.

■ Taxpayer had the burden of demonstrating that the Commissioner's determination that the entire amount of gain on the "straight-line" equipment in question was taxable as ordinary income under Section 1245 was erroneous, and it was thus incumbent on it to show a proper basis for allocating the sales price among the various items of equipment. Even assuming that taxpayer's counsel did not have reason to believe until trial that the Commissioner was not accepting its allocation, the burden of proof remained with taxpayer. Indeed, the Tax Court indicated that it would allow taxpayer to augment the record with further proof on this issue once the initial post-trial briefs were filed, but, for reasons

of its own, taxpayer chose not to take advantage of this opportunity, but to stand on the proof presented at trial. As noted above, the bill of sale did not allocate the purchase price among the individual items of equipment, and no evidence was presented to show that the purchaser placed any particular value on the individual items or, indeed, that any of the individual pieces of fully depreciated equipment had any separate value, except as component parts of an operational power plant.

■ The Tax Court found that the parties intended a sale of the power plants for an unallocated lump sum, and not a sale of individual items of equipment for an aggregate of individual prices, and correctly concluded that it is, therefore, impossible to determine the "amount realized" with respect to any particular item of equipment. This fully supports the Tax Court's determination that it would be impossible, on the record of this case, to properly compute taxpayer's Section 1245 gain on the "straight-line" equipment on an item by item basis, and that the Commissioner was therefore justified in treating the transaction as a sale of the "straight-line" equipment as a single item of Section 1245 property for this purpose.

■ Taxpayer strenuously argues that an allocation based on the respective fair market values of these items of equipment is required even though no allocation was agreed by the parties and even though there is no evidence that the purchaser placed any such separate values on the component parts of the operational power plants. Nothing in the statute, the Regulations or the cases cited by taxpayer requires such an allocation under these circumstances. But even assuming that such an allocation based on fair market values might be proper, taxpayer failed to establish any basis on the record for determining the fair market value of any of the items of equipment involved. The only evidence it presented in this regard was the appraisal report and a letter indicating that the appraiser had allocated the sales price among these items based on a rather artificially

constructed reproduction cost determination for such equipment.

Such a determination, which wholly fails to account for such critical economic factors as obsolescence, is an inadequate basis for determining the actual value of the equipment, and no evidence was presented which would serve in any way to relate the appraisal figures to the true economic value. In short, not only does the record fail to support the allocation made by taxpayer, it fails to provide an evidentiary basis for *any* allocation.

■ The Tax Court did not abuse its discretion in denying taxpayer's untimely motion for further trial in this case. At trial, the Court invited taxpayer to file such a motion in order to augment its proof once the initial post-trial briefs were filed. The record is clear that counsel for all parties fully understood the procedures the Court was suggesting. Nevertheless, taxpayer failed to file such a motion after the briefs were filed, but, instead, chose to rely on the record presented at trial, apparently hoping to succeed on its argument that the burden of proof should be placed on the Commissioner. The Tax Court was thus justified in proceeding to render its findings and opinion on the basis of this record. Under the Tax Court's rules, taxpayer could still have filed a timely motion for further trial within thirty days after the findings and opinion were filed. Again, however, it did not do so, but waited until several more months had passed and decision in favor of the Commissioner had been entered. Under the circumstances, the Court properly denied taxpayer's application to file the motion for further trial out of time, and, hence, properly denied the motion itself.

■■ Taxpayer strenuously argues that an item by item computation is appropriate even in the case of a sale of an integrated group of individual units of Section 1245 property for a lump sum sales price. But, as indicated above, taxpayer's reliance on the provisions of Section 1.1245–1(a)(5) of the Treasury Regulations is misplaced, since those regulations pertain only to the allocation of a lump sum sales price between "section 1245 property" and "non-section 1245 property." The "straight-line" equipment here in issue was *all* Section 1245 property and nothing in the Regulations would serve to require an allocation among the individual units of Section 1245 property sold at a gain in a single transaction where the parties themselves have failed to make such an allocation at the time of the sale. The value of machinery and equipment at a particular time is a question of fact which must be *proved* by competent evidence.

■ No evidence was presented by taxpayer to show the fair market values of the equipment in question. The only evidence it introduced in this regard was the appraisal report itself, and the testimony of taxpayer's accountant as to the manner in which the 1245 computations were performed by taxpayer, based on this appraisal report. The appraisal report itself was not based on any determination of the actual fair market value of the equipment, but on an artificially constructed reproduction cost determination. While replacement cost is one factor which might be taken into account in determining fair market value, it is plainly not the only factor, and standing alone, has been deemed of "questionable weight as valuation evidence." *Carty v. Commissioner,* 38 T.C. 46, 66 (1962). See also *Ingram-Richardson, Inc. v. Commissioner,* P–H Memo T.C., par. 72,157 (1972).

Reproduction cost, even where it can be accurately determined, wholly fails to take into account any economic factors—such as obsolescence—which would prevent any willing buyer from paying such an amount for newly constructed equipment. Some of the equipment here in question was acquired as early as 1926, and it might well be doubted whether such equipment would have any independent value apart from its use in an existing plant.

If an accurate reproduction cost could serve as a basis for a fair market value determination, it appears that the appraiser here did not purport to determine the actual cost of reproduction of this equipment,

*but artificially constructed such a cost by "trending the recorded original cost by subaccount groups to current cost levels by the application of appropriate index numbers." What such "appropriate index numbers" were, is left unexplained. Nor was any evidence produced as to how these determinations would relate to the critical factor here, namely the actual value of the equipment involved.* Clearly, the mere introduction of this appraisal report and letter explaining in general terms how the appraisal was conducted does not satisfy the taxpayer's burden of proving that the allocation reflected therein is proper.

The Tax Court's finding that the parties intended a sale of the integrated plants themselves, and not a sale of 1,500 separate parts of equipment cannot be considered clearly erroneous on the record of this case.

■ It is here to be said that the burden of proof is on the taxpayer to show that the deficiency determination made by the Commissioner is erroneous, and that the presumption of correctness of the deficiency is not lost because the Commissioner relies on alternative theories. There is no prohibition against the Commissioner's raising an alternative theory at the time of hearing so long as the taxpayer has an opportunity to present proof to counter the alternative theory.

As above said, the Tax Court had indicated that it would look favorably upon a motion for further trial to allow the taxpayer to augment the record in the event the Commissioner continued to rely on the alternative argument in his post-trial brief. But the taxpayer failed to make any timely request for the Court to open the proceedings.

It is elementary that the burden of proof is on the taxpayer to show that the deficiency determination made by the Commissioner is erroneous. See *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212. The presumption of correctness of the deficiency determination is not lost because the Commissioner relies on alternative theories and there is no prohibition against the Commissioner raising an alternative theory at

the time of hearing so long as taxpayer has an opportunity to present proof to counter the alternative theory. *Commissioner v. Transport Manufacturing and Equipment Co.,* 478 F.2d 731 (C.A. 8).

As already emphasized, the Tax Court had indicated that it would look favorably upon a motion for further trial to allow taxpayer to augment the record in the event the Commissioner continued to rely on the defense in his post-trial briefs. But taxpayer failed to make any timely request for the Court to reopen the proceedings.

This is not a case where the burden of proof shifts to the Commissioner by virtue of a showing that the Commissioner's deficiency determination was arbitrary and erroneous. Since there was no showing by the taxpayer that some portion of the purchase price paid by Detroit Edison was, in fact, properly allocable to each of the various items in question, there was no requirement that the Commissioner or the Tax Court make such allocation.

The Tax Court's finding that the parties intended a sale of the integrated plants themselves, and not a sale of 1,500 separate items of equipment, cannot be held to be clearly erroneous on what appears before us in this case.

After the Tax Court instructed the parties to proceed with the trial, and indicated that it would be receptive to a motion for further trial, taxpayer did not file a motion for further trial after the Commissioner's brief was filed, as the Tax Court had suggested, and the Court was justified, when it filed its findings and opinion several months later, in assuming that taxpayer had elected to stand on the record originally presented, and had chosen not to attempt to augment its proof in this regard.

■ *Motions for further trial are addressed to the sound discretion of the Tax Court, and its rulings on such motions are subject to reversal on appeal only on a clear showing of an abuse of discretion.*

While the Tax Court's rules permit the filing of such a motion within 30 days after

the opinion is filed, the Court would have been justified in denying such a motion filed after its findings and opinion were filed in light of its clear and unambiguous request that such a motion be filed once the positions of the parties were set forth in the post-trial briefs. However, this question need not be resolved herein since the taxpayer did not file such a motion for further trial during the period prescribed by Rule 161,[1] but waited several more months—until after the decision was entered in December, 1974. There was no abuse of the Tax Court's discretion in denying this untimely filed motion.

In denying these motions for leave to file motion for further trial, and for a further trial, the Court said:

"It has been ten years since the sale. It has been fourteen months since the trial, and the evidence is just bound to be awfully stale. It seems to me that it would be prejudicial to the government for me at this late date to open up the record for you to bring in evidence of, in the first place, whether or not it should be allocated, and secondly, what the allocation is to be to the 1,500 items."

We, accordingly, do not consider any of the questions presented in taxpayer's motion for further trial, filed after the expiration of the time allowed by rule of court, and denied by the Tax Court.

From the foregoing, it is our opinion that the findings and decision of the Tax Court should be, and are hereby, affirmed for the reasons above stated and in accordance with the opinion of Judge Drennen.

---

1. See Rules of Practice, United States Tax Court, (Jan. 1, 1974) Rule 161 of which provides as follows in this regard:

Rule 161

"*Motion for Reconsideration of Findings or Opinion.* Any motion for reconsideration of an opinion or findings of fact, with or without a new or further trial, *shall be filed within 30 days after the opinion has been served,* unless the Court shall otherwise permit." (Emphasis supplied.)