LENZ W. GMELIN AND INGEBORG U. GMELIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gmelin v. Commissioner
Docket Nos. 3673-85, 3831-85.[1]
United States Tax Court
T.C. Memo 1988-338; 1988 Tax Ct. Memo LEXIS 366; 55 T.C.M. (CCH) 1410; T.C.M. (RIA) 88338; July 29, 1988. *366 Petitioners invested $ 120,000 in three partnerships in 1978. On their Federal income tax return for 1978, petitioners deducted $ 478,389 as their distributive share of losses of the three partnerships in issue. Prior to the expiration of the statute of limitations with respect to petitioners' 1978 tax year, respondent audited the three partnerships in issue and proposed adjustments. However, respondent allowed the statute of limitations to expire as to petitioners' 1978 year. Respondent thereafter issued a notice of deficiency as to petitioners' 1979 and 1980 years, determining that petitioners realized income with respect to the partnerships. Held, petitioners did not realize income under the tax benefit rule. Held further, petitioners did not realize income under the alternative theories that the partnerships abandoned the research and development contracts or petitioners abandoned their interests in the partnerships. Held further, when determining the amount of gross income stated on a return for purposes of section 6501(e)(1)(A), a shareholder of a subchapter S corporation, prior to the Subchapter S Revision Act of 1982, includes his proportionate share of the corporation's gross *367 income. Held further, the 6-year statute of limitations set forth in section 6501(e)(1) is not applicable to petitioners' 1979 tax year. Held further, the November 30, 1984, notice of deficiency with respect to petitioners' 1980 tax year is valid. Held further, the November 30, 1984, notice of deficiency with respect to petitioners' 1979 and 1980 tax years does not violate due process. Held further, because petitioners realized no income in 1979 or 1980 with respect to the partnerships, the remaining issues with respect to sections 6013(e) and 6621(c) need not be addressed. Donald A. Richards, for the petitioners. Caroline R. Ades, Edward G. Martoglio, and Frank Agostino for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: In a notice of deficiency dated November 30, 1984, respondent determined deficiencies in petitioners' Federal income tax for the years and in the amounts as follows: Year
Amount
1979
$ 624,106
1980
725,024  Respondent's answers assert that the deficiencies constitute substantial underpayments attributable to tax-motivated transactions within the meaning of section 6621(c). [2] *368 The dispute in this case arises out of petitioners' investment in various coal mining limited partnerships. Respondent audited the partnerships but failed to issue a statutory notice within the statute of limitations for 1978, the year petitioners deducted losses in connection with these partnerships. Respondent thereafter issued a statutory notice with respect to the following 2 years, including in petitioners' income amounts taken as deductions in the earlier year. Petitioners challenge the validity of the later notice and respondent's determination that the amounts deducted in 1978 are includable in petitioners' income for the later years. After concessions, the issues for decision are: (1) whether the 6-year statute of limitations set forth in section 6501(e)(1) is applicable to petitioners' 1979 tax year; (2) whether the November 30, 1984, statutory notice for petitioners' 1980 tax year is *369 valid; (3) whether the November 30, 1984, notice of deficiency violates due process; (4) whether petitioners realized income in either 1979 or 1980 with respect to their 1978 investment in Brandywine Associates (Brandywine), Cherry Run Associates (Cherry Run), and Clear Fork Associates (Clear Fork); (5) whether petitioner Ingeborg U. Gmelin is an innocent spouse under section 6013(e); and (6) whether petitioners' deficiencies constitute substantial underpayments attributable to tax-motivated transactions within the meaning of section 6621(c). FINDINGS OF FACT [3]
Some of the facts have been stipulated and they are so found. Petitioners' residence at the time of the filing *370 of these petitions was in Kinnelon, New Jersey. During the years in issue, petitioners were married and filed joint Federal income tax returns. Background
1. Organization and Operation of the Partnerships Brandywine, Cherry Run, and Clear Fork are three of a number of coal mining limited partnerships organized and promoted by Karl R. Huber (Huber, Jr.) and his father, Karl Huber (Huber). Huber, Jr., is a graduate of the Harvard Law School. He was admitted to the New Jersey Bar in 1965; he was suspended from the practice of law in New Jersey in 1979 and disbarred in 1986. Brandywine, Cherry Run, and Clear Fork were organized in 1978 under the Uniform Limited Partnership Act of the State of New Jersey. At the time of organization, Huber, Jr., was the sole general partner of each partnership. The amended limited partnership agreements required Huber, Jr., to contribute $ 20,000, $ 25,000, and $ 9,000 to Brandywine, Cherry Run, and Clear Fork, respectively. Brandywine had 42 limited partners whose contributions totaled $ 600,000; Cherry Run had 34 limited partners who contributed a total of $ 750,000; and Clear Fork had 31 limited partners who contributed a total of $ 491,000. *371 In 1978 each of the three partnerships entered into the following agreements: (1) lease agreement with Boden Coal Company, a West Virginia corporation (Boden-WV); (2) mining agreement with Stallion Mining Corporation, a West Virginia corporation (Stallion); (3) coal sales or requirements contract with Boden Coal Company, a Delaware corporation (Boden-DEL); and (4) research and development agreement with Cognitech Research Laboratories, Ltd. (Cognitech), a limited partnership formed under the laws of New Jersey. Huber, Jr., drafted all of the agreements for each of the partnerships in issue. The lease agreement between Brandywine and Boden-WV, which was executed on December 29, 1978, involved the coal rights to the Stockton-Lewiston (Lower Bench) seam underlying the Eril Price Tract, and an undivided 24-percent interest in all of the Coalburg seam underlying the Gillespie Tract in Boone County, West Virginia. The lease agreement required Brandywine to pay a production royalty in addition to an advanced minimum royalty of $ 480,000 for the first year of the lease. Section 8 of the lease agreement, which is entitled "Additional Mining Rights and Obligations," includes the following *372 subsection: (b) Lessee [Brandywine] shall begin mining the leased property no later than September 1, 1980. It shall conduct its mining operations in strict compliance with all Federal and State mining laws and regulations and will save Lessor [Boden-WV] harmless for Lessee's failure so to do. Lessee shall be and is obligated diligently to mine and remove all coal that may be mineable and merchantable and that can be profitably removed by Lessee, it being agreed that in event any of said coal cannot be so profitably removed that the Lessee shall be relieved of the obligation of mining the same. The Lessor and Lessee or their engineers, at least as frequently as every six (6) months and more often if required by Lessor or Lessee, shall jointly determine whether Lessee has mined and removed all the mineable and merchantable coal from any given area or part of the leased premises. On October 23, 1978, Clear Fork and Boden-WV executed a lease agreement similar to the agreement executed by Brandywine and Boden-WV. The amount of the advanced minimum royalty was $ 400,000. The lease agreement required Clear Fork to begin mining the leased property (all of the Coalburg seam underlying *373 the Eril Price Tract in Boone County, West Virginia) no later than December 1, 1979. In addition to the lease agreements with Boden-WV, each of the partnerships entered into a mining contract with Stallion. Stallion agreed to commence preparation and development of the property leased by Brandywine, Cherry Run, and Clear Fork on or before September 1, 980, March 1, 1979, and December 1, 1979, respectively. However, Stallion filed for Chapter 11 bankruptcy in November 1979 and no mining was commenced with respect to the three partnerships in issue. Each of the partnerships also executed a coal sales or requirements contract with Boden-DEL.Boden-DEL agreed to purchase from Brandywine 150,000 net tons of coal in 1979 and each calendar year thereafter. The net tons of coal to be purchased by Boden-DEL from Cherry Run and Clear Fork were 200,000 and 130,000, respectively. Additionally, each of the partnerships entered into a Research and Development Agreement (RDA) with Cognitech, a limited partnership, organized for tax purposes. The research and development was to commence on the date of each agreement between Cognitech and the partnerships. Pursuant to the RDA between Brandywine *374 and Cognitech, the latter agreed to develop and to manufacture or license a commercially feasible ultrasonically augmented chemical coal cleaning (desulfurization) process. The RDA required Brandywine to pay $ 2,000,000 to Cognitech on December 29, 1978, the date on which the agreement was executed. Of the $ 2,000,000 consideration to be paid by Brandywine to Cognitech, $ 1,860,000 was paid by Brandywine's promissory note. The note provided for the payment of no interest and payment of principal in monthly installments of $ 38,750 from November 1, 1980, to October 1, 1984. Pursuant to the RDA between Cherry Run and Cognitech, the latter agreed to engage in the research and development of a commercially feasible, stable coal/oil Thixotrope. Cherry Run agreed to pay $ 2,500,000 to Cognitech on July 5, 1978, the date on which the agreement was executed. Of the $ 2,500,000 to be paid by Cherry Run, $ 2,300,000 was paid by Cherry Run's promissory note. The note provided for the payment of no interest and payment of principal in monthly amounts of $ 47,917 from April 1, 1979, to March 1, 1983. The RDA between Clear Fork and Cognitech provided that Cognitech would engage in the development *375 and manufacture or license of commercially feasible Thixogel fire and explosion quenching systems in the mine environment. Clear Fork agreed to pay $ 1,600,000 for the services and of that amount $ 1,500,000 was paid by Clear Fork's promissory note to Cognitech. The note provided for the payment of no interest and payment of principal in the monthly amounts of $ 31,250 from February 1, 1980, until January 1, 1984. The notes payable to Cognitech that were executed in connection with the RDAs were to be paid from coal mining revenue. The notes provide that the "unpaid balance of the principal sum of this Note and interest hereon shall immediately become due and payable, at the election of the holder hereof" upon, inter alia, 6 months default in any payment. None of the partnerships paid the notes to Cognitech, and Cognitech did not institute an action to enforce the notes. The record does not indicate the amount of research, if any, that was conducted with respect to the projects that were the subject of the Cognitech RDAs. Each of the notes payable to Cognitech included the following subordination and liability paragraphs: 6. Subordination: This Note is subject and subordinate *376 to bank institutional and trade indebtedness of the Undersigned and of the Undersigned's partners. The subordination contained herein shall be automatic without the need for further documentation or writing from either the Undersigned or the payee. This Note has been executed pursuant to an agreement under which the Payee is to perform certain research and experimental work for the Undersigned, and is further subject to certain terms of the lease, mining contract, and requirements contract of even date herewith, and has been executed in reliance thereon. 8. Liability: Subject to paragraph 6 hereof, the Undersigned, if more than one, agree to be jointly and severally liable hereunder, and that the term "Undersigned," as used herein means no one or more of them. In connection with the notes, each partnership and Cognitech executed a security agreement granting Cognitech a security interest in the coal lease of each partnership. Each security agreement provided that in the event of default in the payment of the note, such note would immediately become due and payable in full without notice or demand and Cognitech would have all the "rights, remedies and privileges with respect to *377 repossession, retention and sale of the collateral and disposition of the proceeds as [were] accorded by the applicable sections of the Uniform Commercial Code." 2. Partnership Agreements. Huber, Jr., drafted the Brandywine, Cherry Run, and Clear Fork partnership agreements. The agreements provide the following with respect to contributions, liability of partners, and allocation of cash receipts: 2.2 Contributions of the Limited Partners. Concurrently with the execution hereof, each Limited Partner, shall contribute to the Partnership the amount set forth opposite his name on the signature page hereof in cash, and, subject to call, his proportionate share of the principal and interest due on the Partnership note set forth in Article 2.3. The aggregate amount of Contributions contributed by the Limited Partners is herein referred to as the "Initial Capital Contributions," and the proportion which a Limited Partner's Initial Contribution bears to the Initial Capital Contribution of all Partners is herein referred to as a "Proportionate Share." The amount of each Limited Partner's Initial Contribution shall be credited to his capital account. 2.3 Limited Liability and Capacity of *378 Limited Partners. Except for the obligation to make the initial contributions referred to in Section 2.2, and personal liability for his proportionate share of the principal and interest due on the Partnership note set forth in Article 3.2, no Limited Partner shall have any personal liability or obligation for any liability or obligation of the Partnership. No Limited Partner shall be obligated to lend funds to the Partnership for any purpose. No Limited Partner shall be liable for the obligation of any other Limited Partner. * * * * * * 3.2 Allocation of Cash Receipts. Cash receipts shall be applied by the General Partner in the following order of priority: (a) To pay debt service on the Partnership's note to Cognitech and Boden Coal Company (including amortization of principal and accrued interest, if any), and then to provide a reasonable reserve for such payments in the future; (b) To pay any outstanding debts and obligations of the Partnership and then to provide a reasonable reserve for such payments in the future; (c) To the extent that Cash Receipts available at the end of any month are in excess of amounts paid, committed or reserved for payment, as provided in this Section *379 3.2, to pay (within ten (10) days after the end of each such month commencing in 1979), to the Partners in accordance with their respective Proportionate Shares of such Cash Receipts. [4] 3. Partnership Returns. For the tax year ended December 31, 1978, the partnerships reported no income and deducted the following amounts for advanced royalty payments and research and development payments: Research and
Advanced Royalty
Development Deduction
Partnership
Deduction
Payment in Cash
Payment by Note
Brandywine
$ 480,000
$ 140,000
$ 1,860,000
Cherry Run
575,000  200,000  2,300,000  Clear Fork
400,000  100,000  1,500,000  The partnerships reported no income or deductions for the tax year ended December 31, 1979. Furthermore, none of the *380 partnership returns bear the signature of a general partner.
Audit of Huber Partnerships
In mid-1978, William Haas, an Internal Revenue Service (IRS) employee, was assigned the audit of coal partnerships that were organized in 1976 and 1977 by Huber, Jr., and Huber. He was not assigned the audit of Brandywine, Cherry Run, and Clear Fork. The coal mining partnerships that were audited by Haas involved advanced royalty payments, not research and development payments. Haas summarized his audit findings with respect to the 1976 partnerships in a report entitled "Tax Shelter Program." Raymond Ovelman was assigned the audit of Brandywine, Cherry Run, and Clear Fork, which were organized in 1978. He was assigned the audit of the partnerships approximately 1-1/2 years before he closed the audit in the beginning of 1982. Ovelman based his report for the 1978 partnerships on Haas' report for the 1976 partnerships because he did not contact Huber or any of the limited partners. Specifically, Ovelman merely changed the names of the partnerships and the tax year listed on the 1976 reports. When he prepared the explanation of adjustments for the partnerships, Ovelman failed to realize that *381 the questionable deductions were for research and development expenses, and not royalty payments. The engineering services with respect to the Huber coal mining partnerships organized in 1976 and 1977 were provided by Robert Hayes who was assigned to the engineering and evaluation group in the Philadelphia office of the IRS. No engineering services were requested with respect to Brandywine, Cherry Run, and Clear Fork even though Haas spoke to Ovelman about this. Based on the Ovelman audit of the Huber coal mining partnerships organized in 1978, respondent issued a statement of proposed income tax adjustments, with examination changes, to substantially all of the limited partners of the 1978 partnerships with respect to their 1978 tax year. Respondent proposed to disallow the deduction of the limited partners' distributive share of losses from the 1978 partnerships. Respondent also proposed to include as an omission from gross income the limited partners' distributive share of cancellation of indebtedness income resulting from the cancellation of the 1978 partnerships' notes. Salvatore Benvennuti, an appeals officer in respondent's Newark District Office, had administrative responsibility *382 for all appeals filed by the limited partners of Brandywine, Cherry Run, and Clear Fork. Benvennuti settled all appeals cases of the limited partners of these partnerships pursuant to IRS Policy Statement P-4-64, which allowed each limited partner to deduct in 1978 the amount of his cash investment in the partnership. Most of the limited partners of Brandywine, Cherry Run, and Clear Fork settled their cases by executing a Form 870-AD, waiving restrictions on assessment and collection of deficiency in tax resulting from the out-of-pocket settlement. If a limited partner settled his case, then respondent did not assert cancellation of indebtedness income in a subsequent year. If the limited partner did not accept the out-of-pocket settlement, then respondent issued a notice of deficiency; however, these notices do not raise the cancellation of indebtedness income issue. Respondent acted prior to the expiration of the statute of limitations for the 1978 tax year with respect to all of the 1978 Huber partnerships' investors, except petitioners.
Petitioners' 1978 Tax Year
Respondent issued an examination report concerning petitioners' 1977 and 1978 tax years on February 24, 1984, some *383 6 months after the statute of limitations for the year 1978 expired. [5] *384 With respect to petitioners' 1978 tax year, respondent proposed to disallow the deduction of petitioners' distributive share of the losses of the partnerships in issue. Respondent also proposed to include in petitioners' income their share of cancellation of indebtedness income resulting from the cancellation of the partnerships' research and development notes payable to Cognitech. Respondent proposed the following adjustments concerning petitioners' 1978 investment in the three partnerships in issue: Petitioners' Share
Petitioners' Share
of Cancellation of
Adjustment to
of Losses - Per
Indebtedness Income -
Petitioners'
Partnership
1978 Return
Per Audit
Income Per Audit
Brandywine
$ 80,000 $ 60,001 $ 140,001
Cherry Run
198,387  148,387  346,774  Clear Fork
200,002  150,000  350,002  Total        $ 478,389
$ 358,388
$ 836,777
On April 24, 1984, petitioners filed protests concerning respondent's proposed adjustments with respect to their deductions relating to Brandywine and Cherry Run. Petitioners specifically challenged the disallowance of the partnerships' advanced royalty and research and development deductions and the realization of income upon cancellation of the partnerships' indebtedness to Cognitech.
Petitioners' 1979 Tax Year
For the taxable year ended December 31, 1979, petitioners filed a joint Federal income tax return on or before April 15, 1980. Petitioners filed an amended return for 1979 on or about January 18, 1982. Petitioners' original and amended Federal income tax returns for 1979 indicate their gross income as follows: Item
Amount
Wages
$ 126,281 Interest Income
935 Excess Profit Sharing
7,500 Schedule E:
Rent Income  4,450 Income or Losses from Partnerships:  Delta Leasing Associates    6,274 CG-75 Partners    (6,935)
Haleyville Associates    (395,114)
Campbell Company    (2,127)
Canyon Associates    (106)
Turtle Creek Associates    144 Investment Interest Expense    (11,925)
MH & W Elecktrovert-reib G.M.G.H.    15,809 Income from MH & W    International Corp. (MH & W)[6]      345,408 Gross Income
$ 90,594 *385 On November 8, 1982, petitioners signed a Form 872-A extending the time for the assessment of tax for the year 1979 until further action by either party. [7] Petitioners signed a second extension on March 14, 1983. This extension was a Form 872 that specifically limited the scope of the issues for petitioners' taxable year 1979 to Canyon, Haleyville, Sandy, and Malibu. The time for assessment of the tax due for 1979 was extended to April 15, 1984. The 1983 Form 872 did not include a paragraph 3 that was found in the 1982 Form 872-A. (See Appendix A at page 47.) On March 21, 1984, petitioners signed another Form 872-A that extended the period of limitations for 1979 beyond the April 15, 1984, deadline indefinitely. The 1984 Form 872-A continued to limit the scope *386 of issues to Canyon, Haleyville, Sandy, and Malibu. This Form 872-A includes a paragraph 3 identical to that found in the 1982 Form 872-A. On November 30, 1984, respondent issued a statutory notice of deficiency for the tax years ended December 31, 1979, and December 31, 1980. Respondent proposed the following adjustments with respect to petitioners' 1979 tax year: Canyon
$ 30,920 Haleyville
395,114
CG-75
6,935
Brandywine
80,000
Cherry Run
196,387
Clear Fork
200,002
$ 909,358
Respondent determined that petitioners realized income with respect to Brandywine, Cherry Run, and Clear Fork based on the following alternative theories: (1) the constructive sale or exchange of their interests in the three partnerships; (2) constructive receipt of income distributed from the partnerships due to the constructive sale or exchange of partnership property; and (3) deemed distribution of income from the partnerships due to the cancellation of indebtedness.
Petitioners' 1980 Tax Year
Petitioners filed a joint Federal individual tax return for the tax year ending December 31, 1980, on or before April 15, 1981. Petitioners filed amended returns for 1980 in January 1983 and April 1984. No income or losses from *387 Brandywine, Cherry Run, and Clear Fork were reported for this year. Prior to the expiration of the statute of limitations petitioners, on September 17, 1983, and respondent, on December 17, 1983, executed a Form 872-A, extending the period of limitations for assessment indefinitely. On August 29, 1984, petitioners signed a Form 872-T terminating the period of limitations for assessment of taxes due for 1980. Petitioners mailed the Form 872-T to respondent on August 31, 1984. Respondent received the Form 872-T on Saturday, September 1, 1984. Respondent examined petitioners' 1980 return and issued a notice of deficiency, dated October 31, 1984, for the amount of $ 10,019.08. In the notice of deficiency respondent made adjustments with respect to petitioners' distributive share of income or losses from Canyon, Campbell, and Malibu and to certain investment interest expenses. Attached to the notice of deficiency was a Form 4089, Notice of Deficiency -- Waiver. Petitioners did not file a Tax Court petition challenging the notice of deficiency but instead executed the Form 4089 on November 3, 1984, consenting to the assessment of $ 10,019.08. The Form 4089 includes the following: *388 "It will not prevent us from later determining, if necessary, that you owe additional tax; nor will it extend the time provided by law for either action." On November 9, 1984, petitioners mailed the Form 4089 to respondent, who received it on November 13, 1984. On November 30, 1984, respondent assessed the deficiency in the amount of $ 10,019.08, and on December 10, 1984, respondent mailed to petitioners a statement of tax due for tax year ending December 31, 1980. On November 30, 1984, respondent also issued a second notice of deficiency with respect to petitioners' 1980 tax year. [8] In this notice respondent asserted that petitioners realized income in the amount of $ 476,389 in 1980 from their 1978 investments in Brandywine, Cherry Run, and Clear Fork. Respondent relied on the same three alternative theories as he did with respect to adjustments for 1979. Litigation
In September 177, Huber, Jr. , was indicted for numerous Federal offenses, including overcharging the Federal Government in connection with a medical company, mail fraud, conspiracy, and perjury. He was found guilty following a trial *389 in November 1978, and he was incarcerated for a period of approximately 20 months beginning in April 1980. On March 28, 1984, Huber, Jr., Huber, and Donald J. Sheppard were indicted in the United States District Court for the Southern District of West Virginia. Count one of the indictment alleges violation of 18 U.S.C. sec. 371 with respect to the promotion and syndication of numerous limited partnership coal tax shelters and joint ventures, including Brandywine and Clear Fork. The indictment also alleges seven counts of violations of 18 U.S.C. sec. 2 and sec. 7206. On September 12, 1984, Huber, Jr., pled guilty to the violation of 18 U.S.C. 371, alleged in count one of the indictment. In addition to the criminal litigation, Huber, Jr., and Huber were involved in a civil lawsuit. On March 10, 1980, petitioners filed a class action suit in the United States District Court for the District of New Jersey against Huber, Jr., Huber, and numerous entities owned or controlled by them, including Brandywine, Cherry Run, Clear Fork, Boden-DEL, Boden-WV, Stallion, and Cognitech. The class action alleges numerous violations of the Securities Act of 1933 and Securities Exchange Act of 1934. *390 The first count of the complaint alleges that "As a result of the devices, schemes and fraudulent conduct of the defendants, plaintiff has suffered a complete loss of his investment in the syndications." The first count also alleges that "plaintiff will be exposed to adverse tax consequences arising due to the conduct of the defendants, which adverse tax consequences are not properly described in the tax opinion of defendant, Huber." Petitioners sought rescission of the limited partnership agreements and the subscription of the plaintiff as to each of the four limited partnerships of which plaintiff is a limited partner, the cancellation and return of any documents signed by the plaintiff as limited partner in each of the four syndications, and the return of all funds expended by plaintiff pursuant thereto.
In January 1984, the district court entered a default judgment in favor of the plaintiffs in the class action. OPINION The parties' arguments are addressed in the order indicated:
I. Whether the Statute of Limitations for the Year 1979 has Expired
The parties agree that the general 3-year statute of limitations has expired with respect to 1979; however, respondent contends that *391 1979 is not closed because it falls within the 6-year exception, provided in section 6501(e)(1)(A). [9] On June 23, 1986, petitioners filed a Motion for Partial *392 Summary Judgment and Determination of Burden of Proof in docket No. 3831-85. Based on their two Forms 872-A and Form 872, petitioners requested a determination that the statute of limitations for the 1979 tax year expired prior to November 30, 1984, with respect to all issues except those involving Canyon, Haleyville, Sandy, and Malibu. On September 25, 1986, the Court issued a Memorandum Sur Order and Order. The Court stated that section 6501(a) for the 1979 tax year expired prior to the November 30, 1984, notice of deficiency with respect to all issues except those involving Canyon, Haleyville, Sandy, and Malibu. The Court also stated that the three agreements did not preclude respondent from relying on the 6-year statute of limitations under section 6501(e) with regard to the other issues raised in the notice of deficiency, including the issues involving Brandywine, Cherry Run, and Clear Fork. The only unresolved issues at trial involved Brandywine, Cherry Run, and Clear Fork. At the beginning of the trial, respondent stated that the statute of limitations for the unresolved issues in the 1979 tax year was open only if there was a substantial omission of income within the *393 meaning of section 6501(e). Respondent's statement at trial is consistent with the Court's pre-trial Memorandum Sur Order and Order. However, respondent's opening brief argues that the latter Form 872 and Form 872-A did not revoke or modify the initial Form 872-A and, thus, the statute of limitations for 1979 was open under section 6501(c) for all issues in the notice of deficiency, instead of only the issues identified in the second and third agreements. We refuse to address respondent's argument, which is raised for the first time in his post-trial brief and is contrary to his pre-trial memorandum of law and his trial remarks. See Commissioner v. Transport Mfg. & Equipment Co.,478 F.2d 731, 736 (8th Cir. 1973), affg. Riss v. Commissioner,57 T.C. 469, 56 T.C. 388 (1971). Respondent has the burden of proving the applicability of the 6-year statute of limitations. In order to satisfy his burden, respondent must show: (1) that the taxpayer omitted from gross income an amount in excess of 25 percent of the gross income required to be shown in the return; and (2) that the omitted amount was properly includable in gross income. Burbage v. Commissioner,82 T.C. 546, 553 (1984), affd. *394 774 F.2d 644 (4th Cir. 1985); Davenport v. Commissioner,48 T.C. 921, 928 (1967); Bardwell v. Commissioner,38 T.C. 84, 92 (1962), affd. 318 F.2d 786 (10th Cir. 1963); Seltzer v. Commissioner,21 T.C. 398, 401 (1953); Reis v. Commissioner, 1 T.C> 9, 12-13 (1942), affd. 142 F.2d 900 (6th Cir. 1944). [10]
Petitioners argue that section 6501(e)(1)(A) is not applicable because the alleged omissions involving the partnerships in issue do not amount to the requisite 25 percent of gross income stated in petitioners' 1979 return. In so arguing, petitioners interpret the "gross income stated in the return" as provided in section 6501(e)(1)(A) to include their proportionate share of the gross income, not taxable income, of MH & W, a subchapter S corporation. Respondent argues that petitioners' stated gross income includes their proportionate share of MH & W's taxable income. Respondent concedes that if petitioners' stated gross income includes their proportionate share of MH & W's gross income, then the 25-percent omission requisite would not be satisfied. We agree with petitioners. Cf. Ketchum v. Commissioner,77 T.C. 1204 (1981), *395 revd. 697 F.2d 466 (2d Cir. 1982). [11] Thus, the statute of limitations has expired with respect to the year 1979. II. Whether the November 30, 1984, Statutory Notice is Valid as to the Year 1980
Petitioners next argue that because respondent issued two statutory notices with respect to 1980, the second notice is invalid under section 6212(c). Respondent issued the statutory notices on October 31, 1984, and November 30, 1984. Petitioners specifically argue that section 6212(c) precluded respondent from issuing a secondary statutory notice during the time period petitioners had to petition the Tax Court with respect to the first statutory notice. Respondent argues he was not precluded from issuing a second notice of deficiency because petitioners had not filed a Tax Court petition with respect to the first notice of deficiency. Petitioners rely on McCue v. Commissioner,1 T.C. 986 (1943). In McCue, respondent sent two notices of deficiency to the taxpayer *396 as a transferee for estate tax liability. The taxpayer filed a Tax Court petition with respect to the first notice of deficiency after respondent sent the second notice. The taxpayer also petitioned the Tax Court with respect to the second notice of deficiency. The taxpayer filed a motion to dismiss the second proceeding for lack of jurisdiction, and respondent did not object to dismissal of the proceeding on the ground that he had no right to issue a second notice of deficiency. This Court held that it lacked jurisdiction as to the second proceeding. In so holding, the Court referred to section 272(f), the predecessor to section 6212(c), [12] *397 which read, in part, as follows: If the Commissioner has mailed to the taxpayer notice of a deficiency as provided in subsection (a) of this section, and the taxpayer files a petition with the Board within the time prescribed in such subsection, the Commissioner shall have no right to determine any additional deficiency in respect to the same taxable year * * *. The Court went on in dicta to interpret section 272(f) as follows: The obvious purpose of this provision was to restrict the Commissioner if he "has mailed" a notice. The restriction begins with the mailing of the notice and not with the filing of a petition. This is clearly shown by the careful selection of tenses in the above provision. Congress has said, if the Commissioner "has mailed" a notice and the taxpayer "files" a petition within the time prescribed, the Commissioner shall have no right to determine another deficiency in respect to the same taxable year. If Congress had intended the restriction to begin only after a petition had been filed it undoubtedly would have used the past tense of the verb "to file" and it no doubt would have inserted other words in the provision to make this meaning clear. Thus, under this provision the Commissioner is restricted from sending out another notice of deficiency at least until it appears that the petitioner is not going to file *398 a timely petition with this Court. [McCue v. Commissioner, supra at 988.]
We agree with the holding in McCue that this Court lacked jurisdiction as to the petition filed with respect to the second notice of deficiency because in that case the taxpayer filed a Tax Court petition with respect to the first notice of deficiency concerning the same transferee tax liability. See Stamm International Corp. v. Commissioner,84 T.C. 248, 252 (1985); Barth Foundation v. Commissioner,77 T.C. 1008, 1012-1013 (1981); Coleman v. Commissioner,T.C. Memo. 1985-282. However, we decline to follow the dicta in McCue that respondent is precluded from issuing a second notice of deficiency for the same taxable year until after expiration of the period for filing a Tax Court petition with respect to the first notice of deficiency. The dicta in McCue is not supported by the legislative history of section 274(f), which was enacted by the Revenue Act of 1926, Pub. L. 20, 44 Stat. 9, 56. The House Ways and Means Committee proposed that after the commissioner has notified the taxpayer of the deficiency, he shall have no right to determine an additional deficiency in respect of the same taxable year, except *399 in the case of fraud and except as may be provided by the Board of Tax Appeals under the provisions of subdivision (e) of this section. [13] Under this section, if the commissioner has sent a 60-day letter after the enactment of this act, he may not thereafter send another 60-day letter, but must raise before the Board in accordance with subdivision (e) of this section his claim for a deficiency greater than that set out in the 60-day letter. * * * H. Rept. No. 1, 69th Cong., 1st Sess. 10-11 (1925). The Senate Finance Committee responded, in part, as follows: The House bill in section 274(f) provides that if after the enactment of this bill the commissioner has notified the taxpayer of a deficiency, he shall have no further *400 right to determine an additional deficiency except in case of fraud. The committee recommends that this provision be confined to cases where the taxpayer has appealed to the board. If he does not appeal to the board, he has a right to file suit for refund at any time within the statutory period of limitations, and there seems no reason why in such cases the commissioner should not have equal right to assess any further deficiency he may find within the statute of limitations imposed on the Government. * * *
S. Rept. No. 52, 69th Cong., 1st Sess. 27 (1926). The Conference Committee adopted the Senate version of section 274(f). H. Rept. No. 356, 69th Cong., 1st Sess. 40 (1926). Thus the legislative history establishes that section 274(f) was intended to restrict respondent from issuing a second notice of deficiency with respect to the same taxable year only if the taxpayer has filed a Tax Court petition with respect to the first notice of deficiency. See Goff v. Commissioner,18 B.T.A. 283, 288-289 (1929). Section 274(f) does not restrict respondent from issuing a second notice of deficiency until expiration of the period for filing a petition with respect to the first statutory *401 notice. In the instant case, we find that the second notice of deficiency, dated November 30, 1984, for petitioners' 1980 tax year, is valid under section 6212(c)(1). Respondent issued a notice of deficiency on October 31, 1984, for petitioners' 1980 tax year. Petitioners, however, had not filed a Tax Court petition with respect to the first notice of deficiency prior to respondent's issuing the second statutory notice. [14] *402 Under these circumstances, section 6212(c)(1) did not preclude respondent from issuing a second notice of deficiency. See Goff v. Commissioner, supra. Petitioners alternatively argue that the November 30, 1984, notice of deficiency was barred by the statute of limitations. Petitioners argue that the November 30, 1984, notice was issued after the expiration of the statute of limitations in paragraphs (1) and (2) of the Form 872-A they executed with respect to the year 1980. We disagree with petitioners. Petitioners executed a Form 872-A extending the statute of limitations for the year 1980 indefinitely. However paragraph (1) of the Form 872-A limits the extension to the 90th day after: (1) the IRS receives a Form 872-T from the taxpayers; *403 (2) the IRS mails a Form 872-T to the taxpayers; or (3) the IRS mails a notice of deficiency to the taxpayers. See Rev. Proc. 79-22, 1979-1 C.B. 563. In the instant case, the Form 872-A was terminated on September 1, 1984, when respondent received the Form 872-T executed by petitioners. Therefore, the statute of limitations expired under paragraph (1) of the Form 872-A on November 30, 1984. [15] Pursuant to paragraph (2) of the Form 872-A, the extension expires upon the earlier of the date provided under paragraph (1) or "The assessment date of an increase in the above tax that reflects the final determination of tax and the final administrative appeals consideration." Petitioners argue that the October 31, 1984, statutory notice constitutes a final determination of tax for the year 1980 and that the November 30, 1984, assessment of tax with respect to the October 31, 1984, notice terminated the agreement under paragraph (2) *404 of Form 872-A. [16] In response, respondent argues that the October 31, 1984, notice of deficiency was not a final determination of tax within the meaning of paragraph (2) of Form 872-A. Respondent argues that the Form 4089 established that petitioners waived the restrictions on assessment with respect to the deficiency listed in the October 31, 1984, notice and that respondent was not precluded from determining an additional increase in tax for petitioners' year 1980. We agree with respondent. We must look to the plain language of the parties' agreements when interpreting their terms, absent some ambiguity. Constitution Publishing Co. v. Commissioner,22 B.T.A. 426 (1931). In this case, the last sentence of Form 4089 provides: "It will not prevent us from later determining, if necessary, that you owe additional tax; nor will it extend the time provided by law for either action." This language clearly indicates that the October 31, 1984, statutory notice may not be respondent's final determination of petitioners' *405 tax liability for the year 1980. Since there was no final determination of tax for the year 1980 under paragraph (2) of Form 872-A, the expiration date under paragraph (1) is applicable. Therefore, we hold that the statute of limitations for 1980 expired on November 30, 1984, under paragraph (1) of Form 872-A. Accordingly, the notice of deficiency issued on November 30, 1984, is not barred by the statute of limitations. Petitioners' reliance on Roszkos v. Commissioner,87 T.C. 1255 (1986), revd. and remanded    F.2d    (9th Cir., Sept. 14, 1987), to support their argument is misplaced. The issue in Roszkos was whether the mailing of a notice of deficiency to the wrong address (not to taxpayers' last known address) terminated a Form 872-A. The Court held that although an improperly addressed notice of deficiency did not terminate the Form 872-A, the Form 872-A was terminated when taxpayers became aware of the undelivered notices of deficiency. Roszkos v. Commissioners, supra at 1261-1262. In light of its holding, the Court did not address the issue of whether the assessment of tax pursuant to the improperly addressed statutory notice terminated the Form 872-A. Petitioners also *406 argue that respondent is collaterally estopped from issuing the November 30, 1984, notice of deficiency with respect to the 1980 tax year. We do not agree.
The essential elements of collateral estoppel are: (1) there must be false representation or wrongful misleading silence; (2) the error must originate in a statement of fact, not in opinion or a statement of law; (3) the one claiming the benefits of estoppel must not know the true facts; and (4) that same person must be adversely affected by the acts or statements of the one against whom an estoppel is claimed.
Piarulle v. Commissioner,80 T.C. 1035, 1044 (1983), citing Lignos v. United States,439 F.2d 1365, 1368 (2d Cir. 1971). In the instant case, petitioners have not established the presence of the elements of collateral estoppel. Specifically, petitioners did not prove that respondent represented that he would not issue a notice of deficiency in addition to the October 31, 1984, statutory notice. In fact, the language of the Form 4089 indicates that respondent reserved the power to determine additional tax liability for 1980.
III. Whether the November 30, 1984, Notice of Deficiency Violate Due Process
Petitioners argue that *407 respondent's assertion of cancellation of indebtedness income in this case is arbitrary and capricious and violates the due process clause of the Fifth Amendment and principles of equal protection of the laws because respondent did not assert this claim with respect to substantially all of the remaining partners of the partnerships in issue pursuant to Policy Statement P-4-64. [17] The record in this case indicates that a number of the limited partners of the partnerships in issue settled their cases and, in accordance with respondent's Policy Statement P-4-64, were allowed to deduct their cash investment in the initial year. The record also indicates that the limited who settled their cases were not charged by respondent with cancellation *408 of indebtedness income in subsequent years. However, the record does not establish whether respondent offered to settle with respect to petitioners' 1978 year pursuant to Policy Statement P-4-64, prior to the issuance of a notice of deficiency for the years 1979 and 1980. Assuming that respondent did not offer to settle petitioners' case under Policy Statement P-4-64, we see no basis for petitioners' claim that respondent violated the due process clause with respect to them. Generally, we will not look behind a deficiency notice to examine respondent's motives or procedures leading to his determination. Riland v. Commissioner,79 T.C. 185, 201 (1982); Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974). Respondent's failure to follow his own procedures, as set out in the Internal Revenue Manual, is not a violation of the due process clause. Riland v. Commissioner, supra at 201-202. For these reasons petitioners' due process argument must fail.
IV. Whether Petitioners Realized Income in 1979 or 1980
Having determined that respondent's statutory notice with respect to 1980 is valid, we turn now to respondent's substantive arguments. Respondent argues that petitioners *409 realized income in either 1979 or 1980 with respect to their investment in Brandywine, Cherry Run, and Clear Fork. While we have held that the year 1979 is time barred, our disposition of this issue makes it unnecessary to differentiate between the two years. He relies on three alternative theories: first, that petitioners realized income under the tax benefit rule in 1979 or 1980 when the liabilities of the partnerships to Cognitech were canceled; [18] *410 *411 *412 second, the petitioners realized income when the partnerships abandoned their research and development contracts with Cognitech; and third, that petitioners realized income when they abandoned their interests in the partnerships. [19] *413 *414 *415 Respondent argues that petitioners realized income under the tax benefit rule when the partnerships' liabilities to Cognitech were canceled because the partnerships had taken deductions earlier for the liabilities. Petitioners argue that the tax benefit rule is not applicable because their deductions in 1978 with respect to the partnerships in issue were improper. Respondent then argues that the duty of consistency or quasi-estoppel precludes petitioner from arguing that the deductions in 1978 were erroneous. [20] *416 The tax benefit rule requires the recognition of income when a subsequent event occurs that is "fundamentally inconsistent with the premise on which [an earlier] deduction was initially based." (Fn. ref. omitted.) Hillsboro National Bank v. Commissioner,460 U.S. 370, 383 (1983). [21] The purpose of the tax benefit rule is: to achieve rough transactional parity in tax, * * * and to protect the Government and the taxpayer from the adverse effects of reporting a transaction on the basis of assumptions that an event in a subsequent year proves to have been erroneous. * * * Hillsboro National Bank v. Commissioner, supra at 383. Thus, the tax benefit rule deals with the situation in which the deduction becomes improper due to the occurrence of a fundamentally inconsistent event after the close of the tax year in which the deduction was *417 claimed. Hillsboro National Bank v. Commissioner, supra at 378 n. 10. The tax benefit rule is applicable only where the original deduction was proper under applicable law. If the original deduction was improper, then the amount of the deduction recovered in a subsequent year is not includable in the taxpayer's taxable income. Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 559 (1980); Unvert v. Commissioner,72 T.C. 807 (1979), affd. on other grounds 656 F.2d 483 (9th Cir. 1981), cert. denied 456 U.S. 961 (1982); Kingsbury v. Commissioner,65 T.C. 1068, 1087-1088 (1976); Mayfair Minerals, Inc. v. Commissioner,56 T.C. 82, 87-88 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972); Canelo v. Commissioner,53 T.C. 217, 226 (1969), affd. 447 F.2d 484 (9th Cir. 1971); Streckfus Steamers, Inc. v. Commissioner,19 T.C. 1, 8 (1952). We note in this context that in Unvert v. Commissioner,656 F.2d 483, 485, 486 (9th Cir. 1981), the Ninth Circuit rejected the erroneous deduction exception to the tax benefit rule, and chose instead to follow cases in the Second, Sixth, and Seventh Circuits that have rejected or criticized the erroneous deduction exception. See, e.g., *418 Union Trust Co.of Indianapolis v. Commissioner,111 F.2d 60, 61 (7th Cir. 1940), cert. denied 311 U.S. 658 (1940); Kahn v. Commissioner,108 F.2d 748, 749 (2d Cir. 1940); Askin & Marine Co. v. Commissioner,66 F.2d 776, 778 (2d Cir. 1933); Commissioner v. Liberty Bank & Trust Co.,59 F.2d 320, 325 (6th Cir. 1932). The parties have not indicated, and our research has not revealed, any case in the Third Circuit, to which the instant case is appealable, rejecting the erroneous deduction exception to the tax benefit rule. Therefore, we will continue to adhere to our prior holdings. See Golsen v. Commissioner,54 T.C. 742 (1976), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Petitioners argue, as we understand, that their deductions were improper because the research and development notes payable by the partnerships to Cognitech were contingent and thus should not have been considered liabilities accrued by the partnerships or included in petitioners' bases in their partnership interests in the 1978 year. [22] *419 We agree with petitioners. Using the accrual method of accounting, an expense is deductible in the year in which all the events have occurred which determine the fact of liability and the amount of liability can be determined with reasonable accuracy. United States v. General Dynamics Corp.,    U.S.   , 107 S. Ct. 1732, 1735 (1987); United States v. Hughes Properties, Inc.,476 U.S. 593, 600 (1986); sec.1.461-1(a)(2), Income Tax Regs. Under the "all-events" test, the liability must not be contingent. United States v. Hughes Properties, Inc., supra;Dixie Pine Products Co. v. Commissioner,320 U.S. 516, 519 (1944); Brown v. Helverin,291 U.S. 193, 200 (1934). [23]
In the instant case, each of the partnerships in issue used the accrual method of accounting. In 1978, each partnershp entered into research and development agreements that provided that the research and development was to commence on the date of execution of the agreement. All of the agreements provided for payment in cash and notes. [24] *420 *421 No payment with respect to the notes was due in 1978. Each note included a subordination clause that provided that the note was subject to a coal lease, mining contract, and requirements contract. The notes were secured by each partnerships' coal lease. However, the partnerships, of which Huber, Jr., was the general partner, and Cognitech, which was controlled by Huber, understood that the notes would be paid out of revenue from coal production, which was not scheduled to commence in 1978. Under these circumstances, we hold that the research and development notes do not satisfy the "all-events" test during the partnerships' 1978 year. See CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982), affg, in part, revg. in part 73 T.C. 491 (1979), cert. denied 462 U.S. 1106 (1983); Brountas v. Commissioner,692 F.2d 152 (1st Cir. 1982), *422 revg. and remanding 73 T.C. 491 (1979), cert. denied 462 U.S. 1106 (1983). The partnerships, thus, improperly accrued in 1978 the research and development expenses represented by notes, pursuant to section 174. Accordingly, petitioners improperly deducted their distributive share of the losses attributable to the partnerships' 1978 deduction of the research and development expenses that were represented by the notes, and the tax benefit rule does not apply. [25]
We also, for the reasons below, hold that petitioners are not precluded from relying on the improper deduction exception to the tax benefit rule by the duty of *423 consistency or quasi-estoppel. Generally, the duty of consistency, or quasi-estoppel, negate the improper deduction exception to the tax benefit rule. Southern Pacific Transportation Co. v. Commissioner, supra at 559. If the duty of consistency applies, then the taxpayer realizes income in a later year under the tax benefit rule even though the deduction in the earlier year was improper. Southern Pacific Transportation Co. v. Commissioner, supra at 560; Mayfair Minerals, Inc. v. Commissioner, supra at 89. In Unvert v. Commissioner,72 T.C. at 815, [26] we adopted the three elements of quasi-estoppel set forth in Beltzer v. United States,495 F.2d 211, 212 (8th Cir. 1974): (1) the taxpayer has made a representation *424 or reported an item for tax purposes in one year, (2) the Commissioner has acquiesced in or relied on that fact for that year, and (3) the taxpayer desires to change the representation, previously made, in a later year after the statute of limitations on assessments bars adjustments for the initial tax year. [27] In the instant case, the first and third of these requirements are present; the second element is markedly absent. In 1978 petitioners deducted their distributive share of losses of Brandywine, Cherry Run, and Clear Fork, and such deduction reduced their income tax liability. Petitioners then argued at trial in October 1986 that the 1978 deduction was improper. Petitioners, thus, changed their position with respect to the deductibility of the losses in a year after the statute of limitations for 1978 had expired. However, petitioners' representations on their 1978 return did not cause respondent not to issue a notice of deficiency prior to the expiration of the statute of limitations on or before August 22, 1983 (90 days after respondent received the Form 872-T executed by petitioners). *425 In the middle of 1980, respondent began an audit of the partnerships in issue, which were syndicated in 1978. Upon completion of the audit in the beginning of 1982, respondent possessed sufficient information to determine the impropriety of the partnerships' deductions resulting in losses and to determine the impropriety of petitioners' deduction of their distributive share of the partnership losses. Nevertheless, respondent did not issue a notice of deficiency with respect to petitioners' 1978 tax year prior to the expiration of the statute of limitations. Respondent's failure to timely issue a notice of deficiency with respect to petitioners' 1978 tax year is due to his inadvertence, not his reliance upon the representations in petitioners' 1978 return. Under these circumstances, we hold that respondent is barred from asserting the duty of consistency or quasi-estoppel. Petitioners, thus, are not precluded from arguing that the deductions with respect to Brandywine, Cherry Run, and Clear Fork in 1978 are improper. [28] *426 Respondent alternatively argues that the partnerships abandoned their research and development contracts with Cognitech in either 1979 or 1980. Respondent argues that the partnerships' abandonment of the research and development contracts should be treated as a sale or exchange of an intangible asset, and that the partnerships realized a total gain of $ 5,600,000, which is the amount of the discharged debt ($ 5,600,000) less the partnerships' bases in the research and development contracts ($ 0). Based on this argument respondent contends that petitioners realized gain in either 1979 or 1980 in the amount of $ 358,385 (their pro rata share of the partnerships' liabilities) under sections 731(a) and 752(b). Respondent's second alternative argument is that petitioners abandoned their partnership interests in either 1979 or 1980 and that such abandonment *427 constitutes a sale or exchange of intangible assets. Respondent then argues that petitioners realized gain in the amount of $ 358,385 under section 741, which is the difference between petitioners' pro rata share of the partnerships' liabilities ($ 358,385) under section 752(d) and petitioners' basis in the partnerships ($ 0) under section 705(a). Respondent's arguments are apparently based on the rule of law that the amount realized upon the sale or exchange of property subject to a nonrecourse liability includes the amount of the liability. Commissioner v. Tufts,461 U.S. 300 (1983); [29]Crane v. Commissioner,331 U.S. 1 (1947). Respondent's arguments are also based on the factual assumption that the research and development notes constitute valid partnership liabilities for Federal income tax purposes. We disagree with respondent's assumption and therefore find that his alternative arguments are without merit. In 1978 each of the partnerships *428 executed notes in connection with research and development contracts. Brandywine and Clear Fork were to commence payment of the notes in 1980; Cherry Run was to commence payment in 1979. Payment of the notes was contingent upon performance of the research and development contracts, mining contracts, requirements contracts, and certain terms of the coal leases. We previously held that payment of the research and development notes did not satisfy the "all-events" test and thus the liabilities were not deductible by the partnerships. The evidence of record does not indicate the occurrence of events in either 1979 or 1980 that fixed the fact and amount of the partnerships' liability with respect to the research and development contracts. In fact, the evidence of record tends to indicate that the partnerships in issue were not liable for payment of the research and development notes due to the lack of performance of the research and development contracts as well as the mining contracts. Therefore, the research and development notes do not constitute enforceable liabilities for Federal tax purposes. Accordingly, the amount of the liabilities would not be includable in the amount realized. *429 Cf. Fuchs v. Commissioner,83 T.C. 79, 102 n. 10 (1984), and Dean v. Commissioner,83 T.C. 56, 78 n. 10 (1984), in which this Court noted that the cases involved the issue of whether the recourse obligation was a genuine indebtedness to be properly includable in basis and thus the cases did not fit within the context of Crane v. Commissioner, supra, and Commissioner v. Tufts, supra.
Having determined that petitioners are not chargeable with income from their partnership investments in either 1979 or 1980, we need not address the remaining issues. Decision will be entered under Rule 155.
Appendix A
The 1982 Form 872-A reads, in part, as follows: (1) THE AMOUNT OF ANY FEDERAL INCOME TAX DUE ON ANY RETURN(S) MADE BY OR FOR THE ABOVE TAXPAYER(S) FOR THE PERIOD ENDED DECEMBER 31, 1979, MAY BE ASSESSED ON OR BEFORE TH 90TH (NINETIETH) DAY AFTER: (A) THE INTERNAL REVENUE SERVICE OFFICE CONSIDERING THE CASE RECEIVES FORM 872-T, NOTICE OF TERMINATION OF SPECIAL CONSENT TO EXTEND THE TIME TO ASSESS TAX, FROM THE TAXPAYER(S), OR (B) THE INTERNAL REVENUE SERVICE MAILS FORM 872-T TO THE TAXPAYER(S), OR (C) THE INTERNAL REVENUE SERVICE MAILS A NOTICE OF DEFICIENCY FOR SUCH PERIOD(S), EXCEPT THAT *430 IF A NOTICE OF DEFICIENCY IS SENT TO THE TAXPAYER(S), THE TIME FOR ASSESSING THE TAX FOR THE PERIOD(S) STATED IN THE NOTICE OF DEFICIENCY WILL END 60 DAYS AFTER THE PERIOD DURING WHICH THE MAKING OF AN ASSESSMENT WAS PROHIBITED. A FINAL ADVERSE DETERMINATION SUBJECT TO DECLARATORY JUDGMENT UNDER SECTIONS 7428, 7476, OR 7477 OF THE INTERNAL REVENUE CODE WILL NOT TERMINATE THIS AGREEMENT. (2) THIS AGREEMENT ENDS ON THE EARLIER OF THE ABOVE EXPIRATION DATE OR THE ASSESSMENT DATE OF AN INCREASE IN THE ABOVE TAX THAT REFLECTS THE FINAL DETERMINATION OF TAX AND THE FINAL ADMINISTRATIVE APPEALS CONSIDERATION. AN ASSESSMENT FOR ONE PERIOD COVERED BY THIS AGREEMENT WILL NOT END THIS AGREEMENT FOR ANY OTHER PERIOD IT COVERS. SOME ASSESSMENTS DO NOT REFLECT A FINAL DETERMINATION AND APPEALS CONSIDERATION AND THEREFORE WILL NOT TERMINATE THE AGREEMENT BEFORE THE EXPIRATION DATE. EXAMPLES ARE ASSESSMENTS OF: (A) TAX UNDER A PARTIAL AGREEMENT, (B) TAX IN JEOPARDY, (C) TAX TO CORRECT MATHEMATICAL OR CLERICAL ERRORS, (D) TAX REPORTED ON AMENDED RETURNS, AND (E) ADVANCE PAYMENTS. IN ADDITION, UNASSESSED PAYMENTS, SUCH AS AMOUNTS TREATED BY THE SERVICE AS CASH BONDS AND ADVANCE PAYMENTS NOT ASSESSED *431 BY THE SERVICE, WILL NOT TERMINATE THIS AGREEMENT BEFORE THE EXPIRATION. THIS AGREEMENT ENDS ON THE DATE DETERMINED IN (1) ABOVE REGARDLESS OF ANY ASSESSMENT FOR ANY PERIOD INCLUDIBLE IN A REPORT TO THE JOINT COMMITTEE ON TAXATION SUBMITTED UNDER SECTION 6405 OF THE INTERNAL REVENUE CODE. (3) THIS AGREEMENT WILL NOT REDUCE THE PERIOD OF TIME OTHERWISE PROVIDED BY LAW FOR MAKING SUCH ASSESSMENT. Footnotes
1. By Order dated September 24, 1986, docket Nos. 3673-85 ad 3831-85 were consolidated for purposes of trial, briefing, and opinion. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Section 6621(d) was redesignated as section 6621(c) by section 1511(c)(1)(A)-(C)) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. ↩
3. Some of the evidence in this case was accepted under seal and was, pursuant to an Order of the United States District Court for the Southern District of West Virginia at Beckley, disclosed only to the Judge, attorneys, and clerical staff in Division 18 of this Court. While petitioners based some of their proposed findings of fact on the evidence we accepted under seal, we found those facts unnecessary for the disposition of this case. We have included, in our findings, no matters which we reviewed under seal. ↩
4. Section 3.2 of the Brandywine agreement does not include the word "Cognitech" in paragraph (a). Huber did not obtain the consent of the limited partners which, according to the partnership agreement, he needed to amend the agreement. Paragraph (c) of section 3.2 of the Cherry Run Agreement provides for payment of excess cash receipts to commence in 1977, instead of 1979. Presumably, this is a typographical error since the partnership was not organized until 1978. ↩
5. We assume petitioners executed a Form 872-A at least for their 1978 tax year because the parties stipulated that on May 24, 1983, respondent received from petitioners a Form 8772-T (Notice of Termination of Special Consent to Extend the Time to Assess Tax). The statute of limitations for petitioners' 1978 tax year therefore expired on or before August 22, 1983, 90 days after respondent received the Form 872-T. Rev. Proc. 79-22, 1979-1 C.B. 563. See Brown v. Commissioner,T.C. Memo. 1986-239, affd. without published opinion 817 F.2d 754↩ (5th Cir. 1987). Respondent admittedly was inadvertent in not issuing a notice of deficiency prior to this date. 6. The forms 1120 of MH & W for its fiscal years ended July 31, 1979, and July 31, 1980, reflect the following: ↩
July 31, 1979
July 31, 1980
Gross Receipts
$ 9,593,847
$ 12,904,606
Cost of Goods Sold
7,088,400  9,092,890   Gross Profit
2,505,447  3,811,716   Other Income
112,808    77,972      Gross Income
2,618,255  3,889,688   Total Deductions
1,754,736  2,190,359   Taxable Income
$ 863,519  $ 1,699,329 7. See Appendix A at page 47. ↩
8. This was the same notice that covered the 1979 year. See discussion p. 19, infra.↩
9. Section 6501(e)(1)(A) provides the following: (A) General Rule. -- If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated n the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph -- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales and services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item. ↩
10. See Kavoosi v. Commissioner,T.C. Memo. 1986-190; Metas v. Commissioner,T.C. Memo. 1982-36↩. 11. Ketchum v. Commissioner,77 T.C. 1204 (1981), revd. 697 F.2d 466↩ (2d Cir. 1982), involved a tangential issue whereas here we focus on the issue directly. Therefore, we need not consider whether we would follow the Second Circuit.
12. Section 6212(c) was first enacted as section 274(f) of the Internal Revenue Code of 1926 by the Revenue Act of 1926, Pub. L. 20, 44 Stat. 9, 56. Section 274(f) was redesignated as section 272(f) and amended by the Revenue Act of 1928, Pub. L. 562, 45 Stat. 791, 853. Section 272(f) was redesignated as section 6212(c)↩ by the Internal Revenue Code of 1954, Pub. L. 591, 68A Stat. 3, 771.
13. Section 274(e) of the Revenue Act of 1926 read as follows: The Board shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any penalty, additional amount or addition to the tax should be assessed, if claim therefor is asserted by the commissioner at or before the hearing or a rehearing.↩
14. Petitioners apparently argue that if petitioners waive their right to file a Tax Court petition with respect to the first notice of deficiency, then respondent is not precluded from issuing a second statutory notice prior to the expiration of the time period to file a Tax Court petition with respect to the first statutory notice. Petitioners,however, argue that the execution of Form 4089 Notice of Deficiency -- Waiver with respect to the first statutory notice for 19800 does not constitute a waiver of their right to file a Tax Court petition concerning such notice. Therefore, petitioners argue that respondent was restricted from issuing a second statutory notice for 1980 until expiration of the 90-day period for filing a petition with respect to the first statutory notice. We need not address petitioners' argument concerning whether execution of a Form 4089 constitutes a waiver of their rights to file a Tax Court petition with respect to a statutory notice. We have found that section 6212(c)↩ does not restrict respondent from issuing a second notice of deficiency prior to the expiration of the period to file a Tax Court petition with respect to the first notice, unless such petition has already been filed. 15. Petitioners argue that the 90th day following respondent's receipt of the Form 872-T is November 27, 1984. Petitioners' argument is incorrect. By the terms of the Form 872-T, the calculation of the 90 days does not include the date of receipt of Form 872-T. ↩
16. We note that if petitioners'argument were correct, then the statute of limitations would have expired on November 30, 1984, under both paragraphs (1) and (2) of Form 872-A. ↩
17. Petitioners' argue on opening brief that respondent's assertion of cancellation of indebtedness income is inconsistent with his treatment of substantially all of the remaining partners of the partnerships in issue. Petitioners' brief does not specifically refer to the due process clause↩ and principles of equal protection of the laws. However we will consider petitioners' brief as doing so, in light of their Amended Petition and trial memorandum. 18. We have considered petitioners' arguments that respondent did not timely raise the tax benefit rule because he did not indicate his reliance on the rule until trial and that respondent's failure to timely raise the tax benefit rule prejudiced petitioners' ability to prepare for trial. We disagree with petitioners. This Court has the inherent authority to sustain respondent's determination for reasons other than those assigned in his notice of deficiency. Seligman v. Commissioner,84 T.C. 191, 198 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Estate of Horvath v. Commissioner,59 T.C. 551, 555 (1973). However we will not consider a new reason or new issue unless we determine that petitioners have not been surprised or prejudiced in their ability to present their case. Leahy v. Commissioner,87 T.C. 56, 64 (1986); Estate of Horvath v. Commissioner, supra;Nat Harrison Associates, Inc. v. Commissioner,42 T.C. 601, 617 (1964). In Commissioner v. Transport Mfg. & Equip. Co.,478 F.2d 731, 736 (8th Cir. 1973), affg. Riss v. Commissioner,57 T.C. 469, 56 T.C. 388 (1971), the Court of Appeals for the Eight Circuit stated that: Although the most appropriate times to advise the taxpayer of the Commissioner's theories to sustain an assessment would be first in the notice of deficiency and then in the Commissioner's answer, we do not hold that the Commissioner necessarily loses his right to pursue a theory or Code section that is not specifically raised before or at trial. * * * However, the longer the Commissioner delays in not expressly advising the taxpayer of the intended theories, the more reason there is to conclude that the taxpayer has not received fair notice and has been substantially prejudiced so as to deny the Commissioner consideration of theories raised for the first time in post trial briefs. The Commissioner may avoid this uncertainty and discharge his duty of informing the taxpayer by expressly notifying the taxpayer of the intended theories in the deficiency notice and the Commissioners' answer. The Court of Appeals then affirmed this Court's finding that the petitioners were prejudiced by respondent's raising section 482 for the first time in post-trial briefs. Commissioner v. Transport Mfg. & Equip. Co., supra at 736. The instant case is factually distinguishable from the Transport Mfg. & Equip. Co. case. In the Court of Appeals case, the notice of deficiency, respondent's answer, the trial statements and testimony did not expressly refer to section 482. The taxpayers in Transport Mfg. & Equip. Co. were not apprised of respondent's reliance on section 482 until post-trial briefs. In the instant case, the notice of deficiency, answers and amended answers, and trial memorandum do not specifically refer to the tax benefit rule. In his opening statement at trial, respondent first asserted the tax benefit rule as an alternative petitioners did not express surprise at respondent's reliance on the tax benefit rule, and petitioners did not state that they were not prepared to present evidence with respect to the tax benefit rule. See BASF Wyandotte Corp. v. Commissioner,532 F.2d 530 (6th Cir. 1976), affg. 62 T.C. 704 (1974). Additionally, petitioners' opening brief does not argue that the tax benefit rule was not timely raised; rather petitioners' opening brief addresses the substance of the tax benefit rule. Petitioners' argue for the first time in their reply brief that the tax benefit rule should not be considered by this Court because such issue was not timely raised. Under these circumstances, we find that petitioners were not prejudiced in the preparation of their case by respondent's asserting the tax benefit rule at trial. See Commissioner v. Transport Mfg. & Equip. Co., supra at 735 n. 8; Nat Harrison Associates,Inc. v. Commissioner, supra↩ at 617. Furthermore, we find that the tax benefit rule was tried by implied consent. Rule 41(b). 19. In the area of cancellation of liabilities, the cancellation of indebtedness income rule interacts with the tax benefit rule. See 1 B. Bittker, Federal Taxation of Income, Estate and Gifts, § 5.7.2 (1981); Bittker & Kanner, "The Tax Benefit Rule," 26 U.C.L.A. L. Rev. 265, 274 (1978). Cancellation of indebtedness income is realized upon the discharge of indebtedness without adequate consideration. United States v. Kirby Lumber Co.,284 U.S. 1 (1931); Putoma Corp. v. Commissioner,66 T.C. 652, 664 (1976), affd. 601 F.2d 734 (5th Cir. 1979); sec. 61(a) (12). The theory underlying the cancellation of indebtedness rule is the freeing of assets subject to the liability. Therefore, the amount of income realized upon the cancellation of the indebtedness is limited to the amount of assets freed by such cancellation. United States v. Kirby Lumber Co., supra;Estate of Delman v. Commissioner,73 T.C. 15, 32 (1979). The discharge of a nonrecourse liability does not free any asset except those from which the liability might have been paid. See Collins v. Commissioner,T.C. Memo. 1963-285. In contrast, the tax benefit rule provides that "if the obligation has previously been accrued and deducted for tax purposes and the unpaid liability is later canceled by the creditor, taxable income is realized by the debtor on this transaction because of the prior economic benefit derived from the deduction." Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion," 14 Tax L. Rev. 225, 252 (1959). In his notice of deficiency and trial memorandum respondent argues that petitioners realized income due to the deemed distribution that resulted from the cancellation of the partnerships' indebtedness when it became clear that the partnerships would no longer be liable on the notes to Cognitech. In his reply brief, respondent, however concedes that petitioners would not realize income under section 61(a)(12) upon cancellation of the partnerships' liabilities to Cognitech, unless such liabilities are recourse. Respondent provided no rationale for his concession, and he expressly refused to address petitioners' arguments concerning the cancellation of indebtedness income rule. Further, respondent's reply brief did not address the issue of whether the partnerships' liabilities to Cognitech were either recourse or nonrecourse, even though his opening brief reserved the right to do so. Under these circumstances, we find that respondent has abandoned his argument that petitioners realized income in either 1979 or 1980 under the cancellation of indebtedness rule, instead of the tax benefit rule. 20. In their reply brief, petitioners argue that respondent is barred from asserting the duty of consistency or quasi-estoppel issue because such issue was not formally pleaded. We disagree with petitioners. While estoppel and its various counterparts, such as quasi-estoppel, generally must be pleaded and proved ( Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 838 (1980); Rule 39), in the instant case, we find that the issue was tried by implied consent of the parties because petitioners did not object when respondent discussed petitioners' duty of consistency at trial and did not challenge respondent's assertion of the duty of consistency in their opening brief. See Rule 41(b). 21. The Supreme Court consolidated Hillsboro National Bank v. Commissioner,641 F.2d 529 (7th Cir. 1981), and Bliss Dairy, Inc. v. United States,645 F.2d 19 (9th Cir. 1981). We will cite to the Supreme Court's opinion as Hillsboro National Ban v. Commissioner,460 U.S. 370↩ (1983).
22. Respondent did not address the issue of whether petitioners' deductions in 1978 with respect to the partnerships in issue were improper. 23. See Clark Equipment Co. v. Commissioner,T.C. Memo. 1988-111↩. 24. Petitioners argue that the limited partners of the partnerships in issue have no liability with respect to the research and development notes payable by the partnerships to Cognitech. Petitioners, however, do not specifically address the issue of whether the research and development notes are nonrecourse, i.e. neither the general partner nor the limited partners had any personal liability on the notes. Respondent also did not address the issue of whether the notes are recourse or nonrecourse. We find that the evidence of record establishes that the notes payable by the partnerships in issue to Cognitech are, in substance, nonrecourse. Each note includes a signature line for a partner of the respective partnership, and each note includes a liability section that provides that "the Undersigned, if more than one, agree to be jointly and severally liable thereunder, and that the term 'Undersigned,' as used herein means any one or more of them." The liability section of each note is subject to the subordination section which was intended to prevent liability for payment of the note unless services were performed under the research and development contracts as well as the coal lease, the mining contract, and the coal requirements contract. According to Huber, Jr., who prepared the notes, the research and development notes would be paid out of coal mining revenue, and if there was no such revenue, then the notes would not be enforceable. Since the notes were to be paid out of coal mining revenue and no partner was liable for payment of the notes, the notes were nonrecourse. See Waddell v. Commissioner,86 T.C. 848, 902 (1986), affd. per curiam 841 F.2d 264↩ (9th Cir. 1988). 25. Having determined that the Cognitech notes did not create liabilities that satisfied the "all-events" test, petitioners are also correct that their respective partnership bases should not have included their share of these liabilities, permitting them sufficient basis in each partnership interest to cover losses from the partnership. LaRue v. Commissioner,90 T.C. 465 (1988); secs. 704(d) and 752(a); sec. 1.752-1(a), Income Tax Regs.↩ In light of our holding, we need not address the issue of whether a fundamentally inconsistent event occurred in either 1979 or 1980. 26. In Unvert v. Commissioner,72 T.C. 807 (1979), the Tax Court held that the taxpayer was estopped from asserting that the original deduction was improper and, thus, the tax benefit rule was applicable. The Court of Appeals for the Ninth Circuit rejected the erroneous deduction exception to the tax benefit rule. The Court of Appeals, therefore, did not consider the Tax Court's application of the quasi-estoppel theory. Unvert v. Commissioner,656 F.2d 483, 485↩ (9th Cir. 1981). 27. See Stoecklin v. Commissioner,T.C. Memo. 1987-453↩, on appeal (11th Cir., March 4, 1988). 28. We note that respondent states that petitioners have not amended their return for the 1978 tax year. However, respondent has not specifically argued when petitioners should have amended their return for the tax year 1978 in accordance with section 1.461-1(a)(3)(i), Income Tax Regs.↩ Therefore, we will not address the issue of whether petitioners ascertained the impropriety of their 1978 deduction with respect to the partnership prior to the expiration of the statute of limitations for their 1978 tax year. 29. The holding of Commissioner v. Tufts,461 U.S. 300, 310↩, nn. 8 & 11 (1983), that the amount of the nonrecourse debt is included in the amount realized is not based on the tax benefit rule or the cancellation of indebtedness doctrine.